### In re SPRINT CORPORATION SECURITIES LITIGATION.

**This Document Relates To: All Actions.**

No. 01–4080–CM.

United States District Court, D. Kansas.

Sept. 30, 2002.

Karen D. Renwick, R. Frederick Walters, Kip D. Richards, Walters, Bender, Strohbehn & Vaughan, P.C., Kansas City, MO, William S. Lerach, Amber L. Eck, Randall J. Baron, Mary K. Blasy, Milberg, Weiss, Bershad, Hynes & Lerach LLP, San Diego, CA, David R. Scott, James E. Miller, Scott & Scott, L.L.C., Colchester, CT, for Plaintiffs.

J. Emmett Logan, Stinson Morrison Hecker LLP, Mark A. Thornhill, Clayton L. Barker, Spencer, Fane, Britt & Browne, R. Lawrence Ward, Russell S. Jones, Jr., Shughart Thomson & Kilroy, Watkins Boulware PC, N. Louise Ellingsworth, Michael D. Pospisil, Daniel R. Young, Bryan Cave LLP, Joseph M. Rebein Shook, Hardy & Bacon L.L.P., Kansas City, MO, Christina M. Tchen, Michele L. Walton, Eric J. Gorman, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, Paul C. Curnin, Simpson, Thacher & Bartlett, New York City, Catherine C. Whittaker, Shook, Hardy & Bacon L.L.P., Overland Park, KS, M. Patrick McDowell, R. David Kaufman, Brunini, Grantham, Grower & Hewes PLLC, Jackson, MS, for Defendants.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiffs bring this uncertified class action alleging securities fraud in relation to the failed merger of defendant Sprint Corporation and defendant WorldCom, Inc. The approximately thirty named defendants are aligned, according to company affiliation, into two groups for purposes of representation. The first group ("Sprint defendants") consists of Sprint Corporation ("Sprint"), Sprint directors, and Sprint officers. The second group ("WorldCom defendants") consists of WorldCom, Inc. ("WorldCom") and Bernard J. Ebbers. This matter is before the court on Sprint Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint (Doc. 94); plaintiffs' Motion to Strike Certain Exhibits and Impertinent Language Contained in Defendants' Motion to Dismiss (Doc. 105), and Sprint Defendants' Motion to Strike the Hakala Affidavit (Doc. 111).

Also before the court are motions for Joinder of Linda Koch Lorimer and Warren L. Batts in the Sprint Defendants' Motion to Dismiss (Doc. 102); Joinder of Defendant Ron Sommer in the Sprint Defendants' Motion to Dismiss (Doc. 116); Joinder of Defendant Michel Bon in the Sprint Defendants' Motion to Dismiss (Doc. 120); and Joinder of Defendant Andrew Sukawaty in the Sprint Defendants' Motion to Dismiss (Doc. 127). Plaintiffs have not opposed these defendants' requests for joinder in Sprint's Motion to Dismiss. Accordingly, the court grants defendants Linda Koch Lorimer, Warren L. Batts, Ron Sommer, Michel Bon, and Andrew Sukawaty's request to join Sprint's Motion to Dismiss (Docs. 102, 116, 120, and 127).

● WorldCom's Bankruptcy

As a preliminary matter, the court notes that the WorldCom defendants also have filed a Motion to Dismiss (Doc. 89). However, the court declines to rule on this motion due to WorldCom's subsequent bankruptcy filing.

WorldCom filed for Chapter 11 bankruptcy on July 21, 2002. As a result, pursuant to § 362(a) of the Bankruptcy Code, this proceeding against WorldCom is automatically stayed. 11 U.S.C. § 362(a). Accordingly, under the law of

this circuit, this court may not rule upon WorldCom's pending motion to dismiss, regardless of whether WorldCom would be entitled to judgment in its favor. *Ellis v. Consol. Diesel Elec. Corp.*, 894 F.2d 371, 372–73 (10th Cir.1990) (holding district court decision granting summary judgment two weeks after bankruptcy petition was filed invalid and stating "[t]he operation of the stay should not depend upon whether the district court finds *for* or *against* the debtor").

▮▮▮ With respect to Bernard Ebbers, the court is aware that § 362(a) extends the automatic stay provision of the Bankruptcy Code only to the "debtor." The rule followed in the Tenth Circuit is that the stay provision does not extend to the third party defendants or a debtor's co-defendants. *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1330 (10th Cir. 1984). However, under § 105(a) of the Bankruptcy Code, courts may extend the protection of the automatic stay to a debtor corporation's officers, directors, and employees during the pendency of a Chapter 11 case. 11 U.S.C. § 105(a) ("The court may issue any order, or judgment that is necessary or appropriate to carry out the provisions of this title."). The rationale in extending the stay to protect corporate officers, directors, and employees is to prevent those individuals from diverting their energies from the reorganization effort to defending themselves in litigation. *In re Arrow Huss, Inc.*, 51 B.R. 853, 855 (Bkrtcy.D.Utah 1985).

In this case, the court lacks sufficient information to make a determination whether this proceeding should be stayed as to defendant Ebbers. The parties have not briefed the issue, nor has any party requested that this court impose such stay. However, considering the likelihood that this issue will arise in the future, whether before the bankruptcy court or this court, the court declines at this point to rule on defendant Ebbers's motion to dismiss.

## II. Background

### A. Parties

### 1. Defendants

Sprint is a diversified telecommunications corporation which offers long distance, local, and wireless communication services.[1] Sprint's operations are generally divided into two sections: (1) the PCS group, which markets and supplies wireless communication services under the PCS brand name; and (2) the FON group, which is a "catchall" group consisting of all non-PCS business and assets. At the relevant time period, Sprint was the nation's third largest provider of long distance telecommunication services.

At the time pertinent to this lawsuit, WorldCom was the second largest provider of international long distance services to United States based customers and the largest provider of domestically-connected international private voice and data lines.[2] In 1998, WorldCom acquired MCI Communications Corporation, the then second largest provider of long distance telecommunication services in the United States. After WorldCom's acquisition, approxi-

---

**1.** In addition to naming the corporate entity as a defendant, plaintiffs filed against thirty individual defendants associated with Sprint. The Complaint names nine present members of the Sprint board of directors and three former directors. Two of the board members also are officers: William T. Esrey, Chairman and Chief Executive Officer, and Ronald T. Lemay, President and Chief Operating Offi-

cer. The remaining individual defendants are officers of Sprint who are not members of the board of directors.

**2.** On the WorldCom side, plaintiffs named as defendants only the corporate entity and WorldCom's President and Chief Executive Officer, Bernard J. Ebbers.

mately eighty percent of the domestic long distance market was shared by just three providers: AT & T, WorldCom, and Sprint.[3] According to plaintiffs' Consolidated Complaint ("Complaint"), by 1998–1999, Sprint and WorldCom were:

- The largest and second largest of a small group of top-tier providers of Internet "backbone" network services in the United States and the world;
- The second and third largest of three providers who collectively dominated long distance telecommunications within the United States, and between the United States and numerous overseas destinations;
- The largest and third largest of three providers who collectively dominated international private line services to business customers;
- Two of three providers who collectively dominated various date network services to large business customers; and
- Two of three providers who collectively dominated custom network telecommunications services to large business customers.

(Complaint at ¶ 38).

2. Plaintiffs

This securities fraud class action has been brought on behalf of all persons and entities who purchased the publicly-traded securities of Sprint between October 4, 1999 and September 19, 2000 (the "Class Period"). In its Memorandum and Order (Doc. 45) dated September 28, 2001, the court appointed six institutional investors as lead plaintiffs. *In re Sprint Corp. Sec. Litig.*, 164 F.Supp.2d 1240 (D.Kan.2001). As noted earlier, this class action has yet to be certified pursuant to Rule 23 of the Federal Rules of Civil Procedure.

B. Proposed Merger

In the summer of 1999, Sprint's board of directors began preliminary investigations into a possible merger with another telecommunications entity. (Sprint's Mem. in Support of Mot. to Dismiss, Ex. 1 at 45). The leading candidates were BellSouth Corporation, Deutsche Telekom, and WorldCom. Through the summer, negotiations intensified with WorldCom. Principally involved in the negotiations were Sprint's Chairman and Chief Executive Officer ("CEO"), William T. Esrey, and WorldCom's President and CEO, Bernard J. Ebbers. Eventually, on October 4, 1999, a merger agreement and related documents were executed by Sprint and WorldCom. The following morning, before the opening of the markets, Sprint and WorldCom issued a joint press release formally announcing the merger agreement. Pursuant to the merger agreement, Sprint was to be acquired by WorldCom for approximately $129 billion, with WorldCom being designated the surviving corporation. The combination of the two companies was to be the largest merger in history.

As will be discussed below, the corporations issued a joint proxy statement/prospectus ("Joint Proxy") on March 9, 2000. Thereafter, Sprint and WorldCom held simultaneous special meetings on April 28, 2000, for the purpose of seeking shareholder approval of the proposed merger. At the meetings, shareholders of both corporations approved the merger. However, on June 27, 2000, the Department of Justice ("DOJ") filed an antitrust lawsuit to block the merger. The European Commission ("EC") followed by announcing its formal opposition to the merger the next day. Thereafter, on July 13, 2000, Sprint

---

**3.** After WorldCom's acquisition of MCI, the surviving corporation was known as MCI WorldCom. For the sake of clarity, however, the court will continue to refer to the entity simply as WorldCom.

and WorldCom officially terminated their merger agreement.

## C. Plaintiffs' Allegations

### 1. General Scheme

Plaintiffs' Complaint principally alleges that the Sprint and WorldCom defendants perpetrated a fraud on the market in an attempt to gain shareholder approval of the merger, despite the fact that the merger was destined from the beginning to fail. More specifically, plaintiffs allege as follows:

During the 1990s, as part of Sprint's long-term stock incentive plan, Sprint's top executives and directors had been granted options to buy millions of shares of Sprint FON/PCS common stock at prices far below the market value. By 1998, however, virtually all of these options remained unvested, meaning the options were not exercisable. Plaintiffs allege that the Sprint defendants were concerned that, by the time their options naturally vested, the stock value would be greatly reduced due to the enormous capital invested in PCS combined with forecasts of increased competition and slower growth. What was needed, therefore, was a way to accelerate the vesting of the options.

To accomplish this goal, plaintiffs allege the Sprint defendants undertook to modify the "change in control" provision contained in their incentive plan. Pursuant to the incentive plan, a "change in control" of Sprint would immediately accelerate almost all of the outstanding options. According to plaintiffs, in late 1998, the Sprint defendants "secretly" altered the incentive plan so as to define a "change in control" to occur when "Sprint's Stockholders approve a merger in which Sprint is not the surviving entity." In essence, under the newly modified incentive plan, shareholder approval alone, irrespective of the merger's actual viability, would trigger a "change in control." Upon a change in control, the stock options would vest and become exercisable. Plaintiffs allege that the value of the individually named defendants' options, once exercisable, totaled nearly $600 million. Defendant Esrey's options alone are alleged to have been valued at over $300 million. Furthermore, because the incentive plan covered executives throughout Sprint, plaintiffs allege the total windfall for all stock option participants was in excess of $1.7 billion.

With respect to WorldCom, plaintiffs allege that the WorldCom defendants had an incentive to attempt a merger with Sprint, regardless of whether the merger would ever in fact occur. Plaintiffs describe Ebbers as "an exceptionally aggressive executive who was willing to 'play chicken' with the Department of Justice and gamble on getting an acquisition of Sprint past regulators." (Complaint ¶ 42). Ebbers was allegedly willing to challenge regulators, and whether or not the merger survived was inconsequential. If the merger was approved, then WorldCom would acquire Sprint's wireless PCS group, which was essential for WorldCom's continued success. If the merger was blocked, then Sprint, WorldCom's competitor, would suffer the consequences of $1.7 billion in accelerated options.

As alleged by plaintiffs, the foremost goal of both the Sprint and WorldCom defendants was to secure joint shareholder approval of the merger. This was achieved by misleading the market as to (1) the viability of the merger and (2) the financial performance of the two companies.

### 2. Regulator Reaction and Defendants' Response

Considering the size of the proposed merger and the state of competition within the telecommunications industry, regulators from the Federal Communications

Commission ("FCC"), the DOJ Antitrust Division, and the EC were interested in the proposed merger. Even before the corporations officially announced their intent to pursue the merger, an official with the FCC issued a cautionary statement. On September 23, 1999, FCC Chairman Kennard, when asked whether the FCC would approve a possible merger between Sprint and WorldCom, stated:

> You don't hear me saying it's going to be fine ... mergers are very, very fact-specific. American consumers are enjoying the lowest long distance rates in history.... That's a function of one thing: competition. We cannot allow any merger to happen in this industry that turns back the clock of competition.

(Complaint ¶ 43) (alterations in original).

The Complaint goes on to detail numerous statements and acts attributed to domestic and foreign regulatory bodies, which indicated the regulators' building pessimism over the merger. Plaintiffs allege both the Sprint and WorldCom defendants issued false and misleading statements in response to these reports in an effort to reassure the market that the merger would in fact be approved. For the sake of brevity, the court will attempt to summarize plaintiffs' allegations of misleading statements and omissions as follows:

> October 4, 1999—In formally announcing the merger, the companies state that they "anticipate that the merger will close in the second half of 2000." (Complaint ¶ 44).
>
> October 5, 1999—FCC Chairman Kennard ("Kennard") responds to the merger's announcement by stating: "This merger appears to be a surrender. How can this be good for consumers? The parties will bear a heavy burden to show how consumers will be better off." (Complaint ¶ 45).

October 6 and 7, 1999—At a joint news conference, in response to Kennard's statements, Esrey and Ebbers state: "We obviously would not have entered into this transaction if we didn't feel very confident that we could show this was pro-competitive.... We feel very confident that we will be able to show evidence that this is a pro-competitive merger." (Complaint ¶ 46) (citing the *National Post* and *Computer Wire, Inc.*).

October 20, 1999—In a press release, both companies commented that they "anticipate that the merger will close in the second half of 2000." (Complaint ¶ 48).

October 28, 1999—Ebbers indicates he is "confident" that the merger will gain regulatory approval. (Complaint ¶ 49) (citing *Dow Jones News Service*).

October 29, 1999—In a letter to FCC commissioners, Tom Krattenmaker, research director of the FCC's policy office, writes that "any further consolidation among the major long distance providers would be intolerable...." (Complaint ¶ 50).

November 5, 1999—At a Prudential Technology Conference, Robert T. LeMay, Sprint's President and Chief Operating Officer, "expressed confidence" that the merger would be approved. (Complaint ¶ 52) (citing a Prudential Securities report).

November 9, 1999—Kennard reiterates his "misgivings" about the merger by stating: "Now is the time, more than ever before, to make sure any merger will serve the public interest...." (Complaint ¶ 53) (citing *The Kansas City Star*).

November 9, 1999—In a talk with Kansas City, Missouri business leaders, Esrey's remarks are reported as follows: "Esrey said the merger would withstand

the scrutiny of federal antitrust and telecommunications regulators because the consumer long distance market would not be too concentrated as a result of the combination. 'We are comfortable that the facts will be overwhelmingly convincing.'" (Complaint ¶ 54) (citing *The Kansas City Star*).

November 13, 1999—The *Washington Post* reports that "[f]ederal regulators are unlikely to approve the $129 billion merger proposed by MCI WorldCom Inc. and Sprint Corp., ... viewing the arrangement as a severe blow to competition.... Sources said the fusion, as announced, would violate antitrust standards.... In order to gain the blessing of the Justice Department, which must approve the merger along with the FCC, the companies would have to persuade regulators that special circumstances merit disregarding the rule." (Complaint ¶ 55).

November 15, 1999—In response to the *Washington Post* report, Ebbers tells a Warburg Dillon Read conference in New York City "that a 'responsible' person at the FCC has told him that the *Washington Post* report wasn't accurate. Ebbers also said Assistant Attorney General Joel Klein told him 'none of that could be further from the truth....'" (Complaint ¶ 56) (citing *Washington Telecom Newswire*). Plaintiffs allege Ebbers' statement was false because no "responsible" person nor Assistant Attorney General Klein had told Ebbers what he claimed.

November 15, 1999—In a *USA Today* article, the companies reported that they "remained optimistic" that they would win regulatory approval. (Complaint ¶ 57).

November 17, 1999—The companies again report that they are "confident that they would be able to convince regulators that the deal serves the public interest." (Complaint ¶ 58) (citing *Washington Post*).

November 18, 1999—As reported by *The Kansas City Star*, the DOJ "has already asked for more information from the companies, indicating that it will be conducting a full-blown antitrust review." (Complaint ¶ 59).

December 1999—The DOJ hires an experienced antitrust law firm to review the merger for its anti-competitive nature. According to plaintiffs, the last time the DOJ took such a step was when it retained David Boies to work on the Microsoft antitrust litigation. (Complaint ¶ 60).

December 15, 1999—The FCC asks Sprint and WorldCom to amend their applications by providing a description of the Internet services provided by the companies, an assessment of the public interest impact of the merger, and any additional information regarding the Internet market that they believed would assist the FCC in its public interest analysis. (Complaint ¶ 62).

December 16, 1999—In response to the FCC's request for additional information, Prudential Securities states in a report:

[T]he FCC's letter, along with the Justice Department's decision to retain antitrust expert Stephen Axinn, reinforces our views about what investors should expect in the merger review process—a tough, skeptical, and prolonged set of negotiations, likely taking a year, involving a rigorous review of such issues as the Internet backbone assets, the definition of the market served by the companies....

(Complaint ¶ 63).

January 12, 2000—During a luncheon speech at the National Press Club in Washington, D.C., Ebbers' remarks are reported as follows: "[Ebbers] is confi-

dent he will gain approval with 'minor modifications' and that he expected the merger to be completed sometime after June, but before the end of the year." (Complaint ¶ 64) (citing *The Wall Street Journal* ).

February 1, 2000—Sprint and World-Com management hold a conference call, where they are reported to state they "expect the merger to obtain approvals from the DOJ and European authorities by mid 2000." (Complaint ¶ 66) (citing Prudential Securities report).

February 11, 2000—In a *Communications Daily* article, Ebbers indicates the companies' meetings with DOJ officials regarding the merger had "gone very well." Plaintiffs claim this is false. According to plaintiffs, during the meetings, DOJ officials indicated it was very unlikely they would let the merger go through without significant divestitures. (Complaint ¶ 67).

February 21, 2000—The EC's antitrust authorities inform both companies that it will take four months to review the impact of the merger on global voice and Internet services. EC Commissioner Monti states: "The commission has raised serious doubts as to the compatibility of the proposed merger between MCI WorldCom and Sprint, mainly ... [due to] Internet connectivity." (Complaint ¶ 68).

February 28, 2000—In a joint press release, the companies indicate "they expect to close the deal in the second half, after receiving regulatory and shareholder approvals." (Complaint ¶ 69).

March 9, 2000—Sprint and WorldCom issue their joint proxy. According to plaintiffs, the proxy does not disclose the "secret" modification to the "change in control" provision. While the proxy does include disclosures regarding the risks associated with regulatory approval, plaintiffs allege the disclosures are false because they are couched in the abstract, when in fact, defendants already knew there was a substantial probability that the various regulators would block the merger.

The proxy disclosures read as follows:

The merger is subject to the receipt of consents and approvals from various governmental entities, which may jeopardize or delay completion of the merger or reduce the anticipated benefits of the merger. Completion of the merger is conditioned upon filings with, and the receipt of required consents, orders, approvals or clearances from various governmental agencies, both foreign and domestic, including the FTC, the Antitrust Division, European antitrust authorities, the Federal Communications Commission and state public utility or service commissions. These consents, orders, approvals and clearances may impose conditions on or require divestitures relating to the divisions, operations, or assets of MCI WorldCom or Sprint. Such conditions or divestitures may jeopardize or delay completion of the merger or may reduce the anticipated benefits of the merger.

. . . . .

At any time before or after completion of the merger, the Antitrust Division could take such action under the antitrust laws as it deems necessary or desirable in the public interest, including seeking to enjoin completion of the merger or seeking divestiture of substantial assets of MCI WorldCom or Sprint. The merger also is subject to review under state antitrust laws and could be the subject of challenges by private parties under the antitrust laws.

(Complaint ¶ 73).

March 14, 2000—Scott Cleland, a telecommunications analyst and managing director with the LEGG Mason Precursor

Group, made the following prediction in a conference call with institutional investors: "We think that in the next several months, the antitrust division of the Justice Department is going to seek and win a temporary injunction to halt this merger, and that will effectively scuttle this merger...." (Complaint ¶ 75).

March 15, 2000—In response to Cleland's remarks, both companies issued identical responses: "We remain convinced that the merger will go through in the second half of 2000." (Complaint ¶ 76) (citing *The Kansas City Star*).

March 28, 2000—As reported in *The Kansas City Star*, staff for the Washington Utilities and Transportation Commission ("WUTC") officially recommended that the WUTC reject the merger. The staff feared combination of two of the three largest long distance providers would "reasonably be expected to result in higher prices and reduced innovation, which would unambiguously harm consumers and the public interest." (Complaint ¶ 79).

In response to the WUTC announcement, a Sprint spokesman was reported as stating: "We have many, many months to go before any formal decision is made.... We're completely confident that when the time comes that the commission is going to approve the transaction." (Complaint ¶ 79).

March 2000—Sprint sends its 1999 annual report to shareholders, which states: "The merger is expected to be completed in the second half of 2000, with approvals from appropriate regulatory entities and shareholders of MCI WorldCom and Sprint." (Complaint ¶ 80).

April 5, 2000—As reported by analysts from Prudential Securities, "[c]ritics of the merger between Sprint and MCI WorldCom told the FCC during an April 5 three-hour meeting that the merger would create dangerous levels of concentration in long distance residential markets, ... and

among Internet backbone providers, a problem that could not be solved by divestiture." (Complaint ¶ 81).

April 6, 2000—Apparently reporting on the previous day's FCC meeting, *The Kansas City Star* noted: "[O]fficials of the two companies denied that combining their resources would harm the marketplace. 'This merger would not do that,' said Michael H. Salisbury, executive vice president and general counsel for MCI WorldCom, based in Jackson, Miss. 'We don't see a problem.'" (Complaint ¶ 81).

April 2000—Plaintiffs allege officials from both companies met with DOJ authorities -throughout April of 2000. Plaintiffs claim that, within these meetings, the regulators indicated that the DOJ "was very unlikely to approve the merger under any circumstances and certainly not without asset divestments that defendants knew would make the transaction uneconomical to the parties." (Complaint ¶ 85). Plaintiffs further allege defendants failed to disclose this information.

April 19, 2000—The FCC suspends its 180-day investigation into the merger until the companies supply the FCC with further submissions and certain consultation reports. According to plaintiffs, this "demand came immediately after consultants told the FCC that Sprint's and WorldCom's claims that large business users would have numerous options for voice and data services were very dubious." (Complaint ¶ 86). Furthermore, plaintiffs allege defendants failed to disclose this information.

April 26, 2000—Sprint officials were informed by the EC that the companies would soon receive an outline of the EC's concerns regarding the merger. Specifically, one official from the EC noted the Commission was "seriously concerned with the possible anti-competitive aspects of this deal." (Complaint ¶ 87). According

to plaintiffs, defendants did not disclose this information.

April 27, 2000—As reported in *The Kansas City Star*, in response to the EC's statements, a Sprint spokesperson stated: "the commission's statement was a standard part of the European Commission review process and not unexpected. 'We feel very confident that we will be able to address the EC concerns to their satisfaction.... We're confident that the merger will be approved by the EC.'" (Complaint ¶ 87).

On that same day, the Economic Policy Institute issued a report opining that the merger would not survive the DOJ's review.

April 28, 2000—Sprint and WorldCom shareholders approve the merger. In response, Sprint issues a press release stating: "We look forward to completing the merger later this year.... Department of Justice and European Commission approvals are expected within the next few months, with the FCC and the majority of state approvals occurring by the third quarter." (Complaint ¶ 93).

WorldCom also issued a press release, which stated: "The company anticipates the merger to be approved by the Department of Justice in the second quarter of 2000, followed by approval by the Federal Communications Commission, various state government bodies and foreign antitrust authorities in the third quarter of this year. The company anticipates the merger to close soon thereafter." (Complaint ¶ 93).

May 18, 2000—The DOJ staff submits its formal recommendation that the merger be blocked. (Complaint ¶ 95).

May 19, 2000—As reported by the *Wall Street Journal*, in response to the DOJ staff recommendation, the companies' spokesman "said they still expect the deal to proceed. 'We feel confident that the merger ultimately will go through, and that all of the various regulatory reviews will be concluded by fall.'" (Complaint ¶ 95).

June 13, 2000—At Sprint's annual meeting, Esrey states: "it remains unclear if we will or will not get the necessary government clearances to implement the merger." (Complaint ¶ 96).

June 21, 2000—*Bloomberg* issues an article, which discusses Ebbers's apparent knowledge of regulatory opposition:

Ebbers knew more than a year ago that a proposed combination with Sprint Corp. would meet significant regulatory and antitrust fears.

He told a Paine Webber Inc. investor conference on June 9 last year-four months before the Sprint transaction—that regulators would oppose a union of the second-and third-largest U.S. long distance carriers, and the companies weren't in merger talks.

(Complaint ¶ 97).

June 26, 2000—The EC circulates a draft decision among EC governments recommending the merger be blocked. (Complaint ¶ 98).

June 27, 2000—The DOJ files suit to block the merger. (Complaint ¶ 99).

June 28, 2000—The *Wall Street Journal* also reports on Ebbers's interaction with regulators after WorldCom's 1999 merger with MCI: "The regulators told me not to come back with another big one," said Ebbers. "But by October, Mr. Ebbers was back with an even brasher plan: a takeover of No. 3 long distance carrier Sprint Corp. valued at $115 billion. He should have listened to the regulators." (Complaint ¶ 97). On the same day, the EC announces its formal opposition to the merger. (Complaint ¶ 99).

July 13, 2000—Sprint and WorldCom announce the merger has been abandoned.

In sum, the Complaint alleges the defendants knew the following "facts" and failed to disclose them:

- The Sprint/WorldCom merger faced significant regulatory opposition and was expected to be blocked by regulators;
- The Sprint defendants had secretly modified the "change in control" definition in Sprint's [stock incentive] plan, thereby allowing the Sprint defendants to reap hundreds of millions of dollars in ill-gotten proceeds via the acceleration of vested stock options once the merger was approved by shareholders, regardless of whether the merger ever actually occurred;
- At the time the defendants issued the joint Merger Proxy, defendants *already knew* that government entities, including the DOJ, EC, and FCC were delaying and/or preventing the consummation of the merger;
- The FCC had made a special request for additional information and the DOJ had retained special counsel to investigate the antitrust aspects of the merger;
- DOJ and FCC officials would not approve the merger unless defendants made serious concessions, including asset divestments, which defendants refused to make, because doing so would render the merger uneconomical;
- The FCC had stopped the 180 day approval clock in April 2000;
- Sprint's and WorldCom's financial prospects were in dire jeopardy;
- Sprint's first quarter results of 2000 artificially inflated Sprint's profits by at least $50 million by refusing to account for the timely reserves for uncollectible accounts receivable, thus boosting Sprint's reported "record" profits; and
- WorldCom's first quarter results of 2000 improperly manipulated its reserves for uncollectible accounts receivable and failed to properly depreciate its telecom equipment, thus boosting WorldCom's profits.

(Complaint ¶ 106).

3. Financial Disclosures

Plaintiffs also allege Sprint and WorldCom issued false and misleading information regarding their respective financial performances. According to plaintiffs, these false disclosures were necessary to induce shareholder approval and "conceal the deterioration of Sprint's core long distance business." (Complaint ¶ 82).

a. Sprint

On April 18, 2000, Sprint issued a press release detailing its results for the first quarter of 2000 (hereinafter referred to as "1Q00"), which stated:

Sprint today announced record first quarter results. Sprint's consolidated net operating revenues for the quarter were $5.48 billion, an 18 percent increase from $4.65 billion in the first quarter of 1999.

The Sprint FON Group's core businesses reported a strong increase in earnings driven by double-digit growth in operating income in each core business unit. The PCS Group had another quarter of outstanding subscriber growth, with net customer additions of 831,000–the equivalent of adding a new customer every 10 seconds in the quarter. Sprint PCS ended the quarter with more than 6.5 million customers nationwide. The PCS Group also reached a major milestone in the quarter by exceeding the $1 billion quarterly revenue mark for the first time.

(Complaint ¶ 82).

Also on April 18, Sprint management held a conference call with analysts to discuss its 1Q00 results. The Complaint

details numerous reports generated by the analysts after Sprint's release of its 1Q00 results. (Complaint ¶ 83). The favorable reports all focus on Sprint's increased operating performance and decreased "churn rate." The churn rate is the percentage of customers lost or cut off during a period of time. For example, a report plaintiffs credit to Bear Stearns states: "We upgrade our rating on Sprint PCS to Attractive, as management delivers fundamental improvement on churn.... Lower churn helped Sprint add 90,000 more customers. The churn rate fell to 3.0% per month, down from the mid 3% range in 4Q99." (Complaint ¶ 83).

Plaintiffs allege these "record results" were false due to Sprint's failure to make proper and timely provisions for doubtful accounts receivable. Sprint's reported earnings "were overstated (and PCS's loss was understated) due to Sprint's improper manipulation of its reserves (or allowances) for doubtful accounts receivable." (Complaint ¶ 107). Such manipulation, according to plaintiffs, was a violation of Generally Accepted Accounting Principles ("GAAP").

In brief, plaintiffs assert Sprint failed to timely accrue losses resulting from uncollectible receivables. During 1Q00, the FON Group's accounts receivables increased, and, at the same time, Sprint was having problems with both FON and PCS non-paying customers. Instead of increasing its reserves for these doubtful accounts, as plaintiffs allege was warranted, Sprint actually decreased the FON allowances. (Complaint ¶ 114). After 1Q00 results were announced, Sprint eventually was required to record the charges and cut off non-paying customers. By December 31, 2000, Sprint's allowances for doubtful accounts under both FON and PCS had risen dramatically. In short, plaintiffs allege Sprint delayed cutting off non-paying customers till after 1Q00 results were re-leased, consequently decreasing its churn rate and concealing losses. According to plaintiffs, Sprint's 1Q00 Earnings Per Share ("EPS") were overstated by its failure to timely address the doubtful accounts.

### b. WorldCom

As with their allegations against Sprint, plaintiffs assert WorldCom falsified its 1Q00 results by failing to timely accrue losses from uncollectible receivables. (Complaint ¶¶ 125 30). According to the Complaint, WorldCom had significant doubtful accounts but failed to timely raise its allowances.

Plaintiffs also assert WorldCom failed to properly depreciate its telecommunication equipment. (Complaint ¶ 131). According to the Complaint, WorldCom selected an unreasonably long depreciation period for its telecommunication assets, so reducing its depreciation expense and increasing reported income.

### 4. Objective Activity

### a. Exercised Options

According to plaintiffs, the objective activity was obtaining shareholder approval of the merger. Once the Sprint shareholders had approved the merger, the "change in control" clause was activated, and the majority of unvested options immediately accelerated. According to the Complaint, by the end of July 2000, four of Sprint's fifteen principal corporate officers had left the company. These four key executives left the company with over $30 million in stock option benefits. (Complaint ¶ 101). In all, plaintiffs assert that, following the shareholder vote, Sprint executives and employees exercised over 4.3 million options worth over $153 million. (Complaint ¶ 102). Furthermore, within the first six months of 2000, it is alleged 2,179 employees left Sprint.

### b. Market

On September 20, 2000, Sprint announced its 3Q00 results, which revealed lower than forecasted revenues, earnings, and PCS subscriber additions. In particular, the lowered results were the product of a higher than forecasted churn rate. Based on this news, Sprint's PCS shares dropped to $33.25, a forty-nine percent decrease from a Class Period high of $65.50, and Sprint's FON shares dropped to $26.81, a sixty-one percent decrease from a Class Period high of $68.76.

### 5. Plaintiffs' Claims

In sum, the Complaint alleges that the public shareholders of Sprint lost billions of dollars. The Complaint asserts three claims: (1) that pursuant to § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b 5 thereunder, 17 C.F.R. § 240.10b 5, all defendants disseminated or approved of the allegedly false statements specified above; (2) that pursuant to § 20(a) of the Exchange Act, defendants Sprint, Esrey, LeMay, Lorimer, Ausley, Batts, Bon, Hockaday, Hook, Rice, Smith, Sommer, and Turley have controller liability; and (3) that pursuant to § 20(a) of the Exchange Act, defendants WorldCom and Ebbers have controller liability.

- Motions to Strike

- Motion to Strike Certain Exhibits and Impertinent Language Contained in Defendants' Motion to Dismiss

Before addressing the Sprint defendants' arguments for dismissal, the court first must consider plaintiffs' Motion to Strike Certain Exhibits and Impertinent Language Contained in Defendants' Motion to Dismiss (Doc. 105). Plaintiffs request the court to strike numerous exhibits the Sprint and WorldCom defendants have attached to their respective motions to dismiss. Due to WorldCom's pending bankruptcy, as discussed above, the court declines to rule on plaintiffs' motion to strike as it relates to exhibits the WorldCom defendants attached to their motion to dismiss. With respect to the Sprint defendants' exhibits, the court grants in part plaintiffs' motion to strike.

Within its review of a motion to dismiss, the court generally must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference. However, "[i]t is accepted practice that, 'if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.'" *Dean Witter Reynolds, Inc. v. Howsam,* 261 F.3d 956, 961 (10th Cir. 2001), *cert. granted,* 534 U.S. 1161, 122 S.Ct. 1171, 152 L.Ed.2d 115 (2002) (quoting *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997)); *see also Prager v. LaFaver,* 180 F.3d 1185, 1188–89 (10th Cir.1999) (quoting *GFF Corp.*); *Brooks v. Blue Cross & Blue Shield,* 116 F.3d 1364, 1369 (11th Cir.1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, . . . the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendants attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment."). "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive ·document upon which the plaintiff relied." *GFF Corp.,* 130 F.3d at 1385. However, the court is not obligated to consider such extraneous documents, because the deci-

sion to do so rests on the court's sound discretion. *Prager,* 180 F.3d at 1189 (holding district court acted reasonably in declining to consider documents attached to the defendant's motion to dismiss).

Plaintiffs specifically request the court to strike Sprint defendants' exhibits 9, 11, 23, and 28, as well as Sprint's March 12, 1987 Proxy and third quarter 1997 SEC Form 10 Q. Each exhibit will be discussed in turn.

Exhibit 9 is a Sprint press release dated April 19, 2000. Sprint contends that the court should consider the press release because it includes a cautionary statement regarding approval of the Sprint/World-Com merger. The Press Release states as follows:

As part of the merger approval process, the Department of Justice may require that Sprint divest its Internet assets. While discussions with the Department of Justice are preliminary and no decision has been reached, identifying and consolidating those assets would simplify divestiture, if it is required.

■ Specifically, the Sprint defendants argue that the statement should be considered to determine whether a "safe harbor" warning was given.[4] Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), the court must consider all information and documents relevant to the question of whether a defendant gave a safe harbor warning, regardless of whether the information and documents are cited in the complaint. *Karacand v. Edwards,* 53 F.Supp.2d 1236, 1245 (D.Utah 1999). Specifically, the safe harbor provision provides that "the court shall consider . . . any cautionary statement accompanying [a] forward-looking statement, which [is] not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u–5(e).

With respect to oral forward-looking statements, the safe harbor provision explicitly provides that a written cautionary statement contained in an identified, "readily available document" may be incorporated by reference. *Id.* § 78u–5(c)(3). The court finds that the April 19, 2000 press release is properly before the court.

■ Exhibit 11 is an October 17, 2000 press release in which Sprint announced the company's third quarter results. The Sprint defendants argue that the October 17, 2000 press release is relevant to the plaintiffs' accounting fraud claim because that claim rests upon a comparison between the reserves taken for doubtful accounts receivable in the first and third quarters of 2000. In the Complaint, plaintiffs set forth their accounting fraud claim based upon a press release dated September 20, 2000, the last day of the putative class period, in which Sprint announced its projections for the third quarter. However, Sprint's actual third quarter results, announced in the October 17, 2000 press release, fared better than the previously announced September 20 projections. The Sprint defendants argue that the court should therefore consider the October 17, 2000 press release because it is a more accurate representation of Sprint's third quarter results. The court looks to the law in this circuit and holds that, because the October 17, 2000 press release is not attached to or referred to in the Complaint, nor is it incorporated by reference, plaintiffs' motion to strike the October 17, 2000 press release is granted. *See GFF Corp.,* 130 F.3d at 1384.

Exhibit 23 is a December 13, 1999 *Wall Street Journal* article that quotes an October 1999 letter from Tom Krattenmaker, a research director at the FCC's policy of-

fice. The Sprint defendants point out that the Complaint quotes directly from Mr. Krattenmaker's letter without naming the source. The Sprint defendants argue that, given that plaintiffs have provided no source for Mr. Krattenmaker's statements, the court should consider the *Wall Street Journal* article to determine the context of those statements.

■ The court foremost notes that the *Wall Street Journal* article is not attached to or referred to in the Complaint, nor is it incorporated by reference. Moreover, it is not apparent from the Complaint whether plaintiffs learned of the contents of Mr. Krattenmaker's letter via the *Wall Street Journal* article or some other source. Thus, the court cannot conclude that the Complaint implicitly references the *Wall Street Journal* article. As such, the court will not consider the December 13, 1999 *Wall Street Journal* article in ruling on defendants' motion to dismiss.

■ Exhibit 28 is a March 15, 2000 *Kansas City Star* article. The Complaint alleges, "Sprint and WorldCom issued identical responses to Cleland's comments: 'We remain convinced that the merger will go through in the second half of 2000,' according to the March 15, 2000 *Kansas City Star*." (Complaint ¶ 76). Clearly, the court may consider the March 15, 2000 *Kansas City Star* article because it is referenced in the Complaint.

■ Plaintiffs also move to strike Sprint's March 12, 1987 Proxy and third quarter 1997 SEC Form 10–Q. The court need not elaborate on the Sprint defendants' arguments because the court readily concludes that these documents are not attached to or referred to in the Complaint, nor are they incorporated by reference. Additionally, consideration of such documents clearly would raise factual issues. The court hereby strikes Sprint's March 12, 1987 Proxy and third quarter 1997 SEC Form 10–Q.

■ Lastly, plaintiffs move to strike several of defendants' arguments, which plaintiffs contend mischaracterize certain documents. Plaintiffs cite no authority holding that it is appropriate for the court to strike arguments contained in a motion to dismiss simply because a party disagrees with the other party's interpretation or characterization of the documents. Plaintiffs' motion to strike is denied with respect to this issue.

● Motion to Strike the Hakala Affidavit

■ Plaintiffs submitted the affidavit of Scott D. Hakala ("Hakala Affidavit") in response to the Sprint defendants' motion to dismiss. The Hakala Affidavit states an opinion as to the alleged value of certain stock options that vested upon the shareholder vote to approve the Sprint/WorldCom merger. The Sprint defendants move to strike, arguing that the Hakala Affidavit raises facts and expert opinions. The court agrees and therefore will not consider the Hakala Affidavit in ruling on defendants' motion to dismiss. Rather, the court will merely accept as true all well-pleaded facts in the Complaint, including the alleged value of the options received by the Sprint defendants.

IV. Applicable Law

A. Motion to Dismiss Standard

The court will dismiss a cause of action for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure only when it appears beyond a doubt that the plaintiff can prove no set of facts in support of the theory of recovery that would entitle him or her to relief, *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Maher v. Durango Metals, Inc.,* 144 F.3d 1302, 1304 (10th Cir.1998), or when an issue of law is dispositive, *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338

(1989). The court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, *Maher,* 144 F.3d at 1304, and all reasonable inferences from those facts are viewed in favor of the plaintiff, *Witt v. Roadway Express,* 136 F.3d 1424, 1428 (10th Cir.1998). The issue in resolving a motion such as this is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

In the context of securities litigation, the Tenth Circuit has warned that dismissal is "difficult to obtain" due to the fact-sensitive nature of the relevant issues. *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1118 (10th Cir.1997) (citing *Basic, Inc. v. Levinson,* 485 U.S. 224, 240, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Dismissal is appropriate, however, "where the alleged misstatements or omissions are plainly immaterial," or where the plaintiff has failed to satisfy established pleading requirements. *Id.*

B. Section 10(b), Rule 10b–5, and the Private Securities Litigation Reform Act

Section 10(b) of the Exchange Act provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national securities exchange—

. . . . .

(b) To use or employ, in connection with the purchase of sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Read in conjunction with § 10(b), Rule 10b–5 provides:

It shall be unlawful for any person . . .

. . . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading . . .

. . . . .

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a valid claim under § 10(b) and Rule 10b 5, therefore, a plaintiff is required to allege: "(1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages." *Grossman,* 120 F.3d at 1118 (noting that in "fraud on the market" cases, an investor's reliance on public material misrepresentations is presumed). Traditionally, Rule 9(b) of the Federal Rules of Civil Procedure governed the pleading requirements for claims brought under Rule 10b–5. *See* Fed.R.Civ.P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.").

In 1995, however, Congress reinforced Rule 9(b)'s pleading requirements by enacting the Private Securities Litigation Reform Act (PSLRA). 15 U.S.C. § 78u–4 *et seq.* Congress designed the PSLRA to

deter perceived abuses of private securities litigation. *City of Philadelphia v. Fleming*, 264 F.3d 1245, 1258 (10th Cir. 2001). "The PSLRA thus mandates a more stringent pleading standard for securities fraud actions in general, and for scienter allegations in particular." *Id.*

First, with regard to material misstatements and omissions, the PSLRA requires:

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading:

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). Second, with regard to scienter, the PSLRA requires:

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*Id.* § 78u–4(b)(2).

■ Now, to sufficiently allege a Rule 10b 5 claim under the PSLRA and Rule 9(b), a plaintiff must plead with particularity not only facts constituting fraud but also facts permitting a strong inference that the defendant or defendants acted with the requisite state of mind, or scienter. "Con-

sequently, defendants moving to dismiss can now challenge the particularity of allegations regarding both the allegedly false or misleading statements, *and* the alleged state of mind." *In re Ribozyme Pharms., Inc. Sec. Litig.*, 119 F.Supp.2d 1156, 1162 (D.Colo.2000) (emphasis in original).

## V. Discussion

### A. Defendants' Affirmative Statements and Omissions Regarding the Merger

As detailed above, plaintiffs' Rule 10b 5 claim against the Sprint defendants is based primarily on defendants' allegedly false statements and omissions regarding the viability of the Sprint/WorldCom merger. As to misleading statements, plaintiffs' claim relies almost exclusively on the defendants' multiple statements of "optimism" or "expectation" regarding regulatory approval. Plaintiffs do not argue, nor does the Complaint allege, that any defendant proffered a guarantee or promise that the merger would be approved. Furthermore, the statements at issue do not concern "hard" financial information regarding corporate performance but rather are forward-looking predictions or opinions concerning on going regulatory proceedings. Defendants contend that, even after construing the Complaint's allegations as true, the statements proffered by plaintiffs fail to state an actionable claim under § 10(b) and Rule 10b–5.

### 1. Opinions and Beliefs May Support Liability

■ As a starting point, the court acknowledges that merely packaging a false or misleading statement as a belief or opinion does not automatically insulate the speaker from § 10(b) or Rule 10b–5 liability. In *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093–94, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Supreme Court made clear that statements couched

as opinion or belief may be actionable if the opinion is (1) known by the speaker to be false when made or (2) made without a reasonable basis in fact. *See Grossman*, 120 F.3d at 1120 n. 6 (discussing *Virginia Bankshares*); *see also In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir.1996) ("Optimistic statements may constitute a basis for a claim under Section 10(b)."); *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir.1993) ("Material statements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and opinion is not factually well-grounded."); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 266 (2d Cir.1993) (acknowledging opinions or belief may be actionable pursuant to *Virginia Bankshares*).

In line with *Virginia Bankshares*, plaintiffs allege that "(1) defendants did not actually believe that the merger would obtain regulatory approval; (2) there was no reasonable basis for defendants' statements that they "expected" regulatory approval ...; and (3) defendants were aware of facts both before and during the Class Period tending to seriously undermine the accuracy of their positive reassurances...." (Pls. Response at 3). While the court agrees that opinions or beliefs may be actionable, the subject matter of such opinion based statements must first be material. As enumerated earlier, the first element of a § 10(b) or Rule 10b–5 claim is a *material* misstatement. Whether a statement was false is inconsequential if the subject matter of the statement is immaterial. *See Basic*, 485 U.S. at 238, 108 S.Ct. 978 ("[I]n order to prevail on a Rule 10b–5 claim, a plaintiff must show that the statements were *misleading* as to a *material* fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.") (emphasis in original). In other words, unless the defendants' professed optimism concerned a material fact, merely alleging that defendants did not believe their words of confidence or that such confidence lacked any reasonable basis is not sufficient to state a § 10(b) or Rule 10b–5 claim. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996) ("[N]ot every unfulfilled expression of corporate optimism, even if characterized as misstatement, can give rise to a genuine issue of materiality under the securities laws ....."), *superseded by statute as stated in Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir.1999). The viability of plaintiffs' claim, therefore, turns primarily on the issue of materiality.

2. Materiality Defined

The definition of materiality in the context of securities litigation has long been established. "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock." *Grossman*, 120 F.3d at 1119 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978). However, "[w]hether information is material also depends on other information already available to the market; unless the statement 'significantly altered the total mix of information' available, it will not be considered material." *Id.* (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126).

In the context of a Rule 12(b)(6) motion, the court is reminded that materiality is a mixed question of law and fact and ordinarily should be reserved for the trier of fact. *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir.1994) (stating that "materiality" is a "fact-specific issue which should ordinarily be left to the trier of fact"). Only if defendants' statements are obviously immaterial may the court grant

defendants' request for dismissal. *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 n. 13 (3d Cir.1993). In asserting that their statements of optimism fail to satisfy the materiality threshold, defendants offer several distinct but interrelated arguments: (1) that their statements represent immaterial corporate optimism; and (2) that their statements or alleged omissions were immaterial because they failed to alter the "total mix" of information available. The court will now address these two related issues.

3. Corporate Optimism and the "Total Mix" of Available Information

As described by the Tenth Circuit, "[s]tatements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification." *Grossman*, 120 F.3d at 1119. Furthermore, these "[v]ague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Id.; see also Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993) ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen."). As the *Grossman* opinion makes clear, statements of sales puffery do not support a Rule 10b–5 claim because of their inability to influence reasonable investors not because of their inherent optimistic nature. *See also id.* (" 'Soft,' 'puffing' statements ... generally lack materiality because the market price of a share is not inflated by vague statements predicting growth.").

Federal courts weighing this issue have found a wide array of statements to be immaterial sales puffing. *See, e.g., Grossman*, 120 F.3d at 1119–20 (company "had experienced 'substantial success;' " "merger presented a 'compelling set of opportunities' for the company;" and company

" 'expects that network applications will quickly reshape customer expectations' "); *Shaw*, 82 F.3d at 1219 ("company 'going reasonably well;'" "company was 'basically on track;' " and defendant "was 'confident that [company] was pursuing the right strategy' "); *Raab*, 4 F.3d at 289 ("regulatory changes ... have created a marketplace for the [company] with an expected annual growth rate of 10% to 30% over the next several years" and "the [company] is poised to carry the growth and success of 1991 well into the future"); *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F.Supp.2d 1283, 1291 (D.N.M.2002) ("[the company] is well positioned to thrive ..." and " '[w]e think [the product] will give the company a unique competitive advantage' "); *Kas v. First Union Corp.*, 857 F.Supp. 481, 490 (E.D.Va.1994) ("defendants had 'agreed to use best efforts' to consummate the merger").

On the other hand, several courts have found statements of optimism uttered by company insiders actionable under § 10(b) and Rule 10b–5. *See, e.g., Warshaw v. Xoma Corp.*, 74 F.3d 955, 959–60 (9th Cir. 1996) (regarding an on going application to the FDA, defendants stated "we are encouraged by the progress FDA is making in its review ... [w]hen the trials are combined, we believe the safety and effectiveness of E5 is clearly demonstrated"); *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir.1995) (company stating it "anticipates a continuation of its accelerated expansion schedule"); *In re Honeywell Int'l Inc. Sec. Litig.*, 182 F. Supp 2d 414, 425–26 (D.N.J. 2002) (denying motion to dismiss in case involving statements described by the defendants as merely "misguided optimism"); *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F.Supp.2d 955, 961–62 (C.D.Cal.2000) (defendants' "statements represented that the web site was in 'development,' that [defendants] 'expected' to have the web site up

and running by the end of the second quarter").

There is no bright-line test for determining when an optimistic statement crosses the line between immaterial puffery and material misstatement. However, the court has discerned several key factors for consideration.

■ First, there is a distinction between optimistic "spin" of presently verifiable facts and optimistic forecasts of future events. As a general rule, optimistic opinions or beliefs regarding actual past or present facts are more likely material than statements couched as optimistic predictions. *See generally Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir.1994) ("Misstatements or omissions regarding actual *past* or *present* facts are far more likely to be actionable than statements regarding projections of future performance.") (emphasis in original); *Raab*, 4 F.3d at 290 ("[W]e recognize that expressions of belief or opinion concerning *current* facts may be material. We do not believe, however, that this materiality extends so easily to opinions on uncertain future events.") (emphasis in original) (internal citation omitted).

The justification for this general rule lies within the definition of materiality itself, namely, whether a "reasonable" investor would consider such information important. *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126. As the *Grossman* court noted, material statements, as compared to immaterial puffery, "could have and should have ... some basis in objective and verifiable fact." 120 F.3d at 1123. Opinions offered as to uncertain outcomes are, by their very nature, generally unverifiable by reasonable investors. Unverifiable information disseminated to the market bears little materiality because reasonable investors do not rely on such information. *See id.* at 1122–23 ("These are the sort of soft, puffing statements, *incapable of objective veri-*

*fication*, the courts routinely dismiss as vague statements of corporate optimism.") (emphasis added); *In re Sun Healthcare Group, Inc.*, 181 F.Supp.2d at 1291 (finding statements immaterial because, in part, "[i]t would be impossible to objectively verify such soft statements that merely convey the subjective assertions of the speaker").

■ Second, the materiality of optimistic statements should be closely scrutinized when the § 10(b) and Rule 10b 5 claim at issue is premised on a "fraud on the market" theory of liability. As the First Circuit noted:

Review of vaguely optimistic statements for immateriality as a matter of law may be especially robust in cases involving a fraud-on-the-market theory of liability. In such cases, the statements identified by plaintiffs as actionably misleading are alleged to have caused injury, if at all, not through the plaintiffs' direct reliance upon them, but by dint of the statements' inflating effect on the market price of the security purchased.

*Shaw*, 82 F.3d at 1218. The *Shaw* court went on to state that a "fraud on the market" claim "can draw no sustenance from allegations that defendants made overly-optimistic statements if those statements are ones that any reasonable investor (ergo, the market) would easily recognize as nothing more than a kind of self-directed corporate puffery." *Id.*

■ Third, as with any alleged misstatement, an optimistic statement's materiality must be adjudged in light of the "total mix" of information available to the market. *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126. In the majority of the cases wherein courts have found optimistic projections actionable, the courts also have found accompanying omissions of material fact. For example, in *Warshaw*, a case heavily relied upon by plaintiffs, the defendant corporation was seeking FDA approv-

al for one of its pharmaceutical products. 74 F.3d at 957. Before the FDA officially released its decision, the defendants made several statements assuring the market that FDA approval was "imminent." *Id.* In fact, as negative indications concerning approval entered the market, the defendants responded with optimistic forecasts. *Id.* at 958. In the end, the FDA denied approval of the drug. *Id.* Within their federal securities claim, the plaintiffs alleged the defendants "manipulated the market by intentionally issuing . . . false and misleading representations. . . ." *Id.* at 958. In reversing the district court's Rule 12(b)(6) dismissal, the Ninth Circuit held:

> The Complaint alleges that [defendants'] optimistic statements about [the drug], when taken in context, were designed to prevent shareholder flight in the aftermath of a damaging report regarding the possible hazards of [the drug] and the unlikelihood of FDA approval. *These optimistic statements allegedly contravened the unflattering facts in [the defendants'] possession.* On these facts, we believe the Complaint alleged a sufficient basis for a claim under section 10(b) and Rule 10b–5.

*Id.* at 959–60 (emphasis added).

The "unflattering facts" alluded to by the *Warshaw* court were based on internal clinical studies performed by the defendants, which revealed that the drug "might not work and would never be approved by the FDA." *Id.* at 959. The plaintiffs in *Warshaw* alleged the existence of the clinical studies as well as the defendants' subsequent failure to disclose the studies' results. *Id.* at 958. Due to the materiality of the omitted information, the optimistic statements were much more likely themselves to be material. In other words, if investors had been fully aware of the negative clinical studies, the market could better have weighed the value of the corporate insiders' statements, and the securities would have been appropriately priced. The court interprets the *Warshaw* opinion as turning on this integral fact of nondisclosure.

In reaching its conclusion in *Warshaw*, the Ninth Circuit cited extensively to its earlier opinion in *Fecht*. In *Fecht*, also a § 10(b) and Rule 10b 5 case, the plaintiffs alleged the defendants "intentionally misrepresented the financial condition of the Company, in particular its expansion program's prospects for enhancing the Company's earnings." 70 F.3d at 1080. The defendants had issued numerous optimistic statements regarding its business expansion, including a report stating that they "anticipate[d] a continuation of its accelerated expansion schedule." *Id.* at 1081. The *Fecht* complaint also included a list of material information known, but undisclosed, by the defendants, which strongly indicated the expansion program's negative performance. *Id.* at 1081 n. 2. In again reversing the district court's dismissal, the Ninth Circuit found:

> The cautionary statements cited by the district court, when considered against the backdrop of the allegations [of known but undisclosed adverse information]—allegations which at this stage we must accept as true—do not 'so obviously' render the challenged public documents not misleading as to permit adequacy of the disclosure to be determined as a matter of law.

*Id.* at 1081 (internal citation omitted). Once again, the Ninth Circuit concluded the optimistic statements in *Fecht* were actionable, in part, because of the materiality of the nondisclosed information undermining the truth of the statements.[5]

---

**5.** This trend of material nondisclosure appears in the remaining cases plaintiffs assert stand for the proposition that optimistic pro-

jections are actionable. *See Helwig v. Vencor, Inc.,* 251 F.3d 540, 556 (6th Cir.2001) ("We conclude that there is a substantial likelihood

With these factors established, the court now turns to the statements and omissions at issue in the present case. Initially, the court notes that, without question, defendants' statements of optimism regarding the regulators' approval are predictive in nature. Each statement expresses "confidence" about or an "expectation" of the outcome regarding an uncertain proceeding. As such, the statements would appear to fall outside the normal spectrum of material statements under § 10(b) and Rule 10b–5. *See In re PLC Sys., Inc. Sec. Litig.*, 41 F.Supp.2d 106, 118 (D.Mass.1999) ("Mere expressions of hope or expectation regarding future approval, not worded as guarantees, are not actionable."); *Kas v. First Union Corp.*, 857 F.Supp. 481, 490 (E.D.Va.1994) ("Because defendants' statements were no more than 'expressions of optimism' about the future consummation of the merger, they were not actionable under Sec 10(b) or Rule 10b–5."). However, to grant dismissal at this stage in the proceedings, the court must be convinced that the market could "easily" determine the statements at issue to be nothing more than immaterial puffery. *Shaw*, 82 F.3d at 1218.

Reviewing the "total mix" of available information, the court finds that the Complaint alleges three instances of material omissions. (Complaint ¶¶ 85–87). The first allegation of material non-disclosure is the meetings and communications throughout April of 2000 between officials from both companies and DOJ authorities. (Complaint ¶ 85). According to plaintiffs, at these meetings, both companies were informed that the DOJ was unlikely to approve of the merger.[6] (Complaint ¶ 85). The Complaint alleges this information was not disclosed. The second instance of nondisclosure alleged by plaintiffs is that both companies were informed on April 19, 2000, nine days before the shareholders' vote, that the FCC was suspending its investigation into the merger until further documentation was provided by the companies. (Complaint ¶ 86) (stating FCC suspended its 180–day investigation at day seventy-five). According to the Complaint, the decision to suspend the investigation represented "an extremely negative development," which the defendants failed to disclose. (Complaint ¶ 86). Thirdly, plaintiffs assert that on April 26, 2000, the EC informed both companies of its "serious concerns" regarding the merger, which the defendants also failed to disclose. (Complaint ¶ 87). Although aware of this adverse information, the defendants continued their release of optimistic statements.

In line with *Warshaw* and the cases discussed above, the court finds the release of the above information, especially the FCC's decision to suspend its investigation, would have been seen by a reasonable investor as significantly altering the "total mix" of available information. Although the market was aware of the possi-

---

that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available.") (internal citation omitted); *In re Honeywell Int'l Inc. Sec. Litig.*, 182 F.Supp.2d at 419 ("There were other undisclosed problems which defendants covered up so that they could perpetrate the illusion that new Honeywell was thriving."); *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F.Supp.2d at 961 ("In that regard, it appears to the Court that disclosure of the fact that Defendants had not yet entered into a con-

tract with IBM to design and build the web site would certainly have been considered an important part of an investment decision by any shareholder.").

6. Specifically, plaintiffs allege that the DOJ authorities indicated to both companies that the DOJ was very unlikely to approve the merger under any circumstances, and certainly not without asset divestments that defendants knew would make the transaction uneconomical to the parties. (Complaint ¶ 85).

bility of regulatory opposition, the court finds that the FCC's decision significantly elevated the risk from threatened opposition of the merger to preliminary blockage. In light of such material omissions, the defendants' optimistic statements reassuring the market bear a stronger degree of materiality.

In response, the Sprint defendants draw the court's attention to authority holding first, that a company is under no duty to update a forward-looking statement and second, that a company need not update investors on the advance of regulatory proceedings. *See* 15 U.S.C. § 78u 5(d) ("Nothing in this section shall impose upon any person a duty to update a forward-looking statement."); *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996) ("Once a utility has informed investors that it is involved in a regulatory proceeding, it has no affirmative duty to provide investors with a further summary of the regulatory process.") (quoting *Sailors v. N. States Power Co.*, 4 F.3d 610, 612 (8th Cir.1993)). The court is unpersuaded. By voluntarily choosing to speak about the merger's viability, the defendants were under a duty to be honest and forthright. *Helwig*, 251 F.3d at 562 ("With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known-but it may not choose half-truths.").

 Significantly, the only material omissions alleged in the Complaint occurred well after the majority of the statements at issue were uttered by the Sprint defendants. The court therefore grants Sprint defendants' motion in part. Those optimistic statements occurring prior to April of 2000 are deemed to be immaterial

as a matter of law. These statements were predictive in nature, and the court finds, based on the "total mix" of information available at the time they were made, an investor could "easily" have recognized the statements as merely puffing. The Complaint contains no facts supporting plaintiffs' allegation that, prior to April of 2000, the defendants "knew" regulatory approval was not possible. According to the facts alleged in the Complaint, up to April of 2000, the defendants knew what the market knew, namely that regulators were going to be highly critical of any such merger. Put succinctly, prior to April of 2000, the Complaint fails to allege any secret or otherwise unknown information, which, if released by the defendants, would have significantly altered the "total mix" of available information. *See Wells v. Monarch Capital Corp.*, 129 F.3d 1253 (1st Cir.1997) (affirming district court's finding that alleged misstatements of opinion were immaterial because other public filings fully disclosed the true nature of the underlying business concern). Therefore, the court grants the Sprint defendants' motions to dismiss as to the statements contained in the following paragraphs of the Complaint: ¶¶ 44, 46–49, 51, 52, 54, 57–58, 65, 66, 69, 71,72, and 76–81.

However, after April of 2000, the Sprint defendants were in possession of information, which, if released,[7] would have altered the "total mix" of available information. The court is unable to conclude that the Sprint defendants' nondisclosure of this information and their optimistic statements predicting regulatory approval were "obviously" immaterial. Accordingly, the Sprint defendants' optimistic statements and omissions which the court will consider in the remainder of this opinion are con-

---

7. As to the alleged omissions, the defendants make no argument that the omitted information had adequately reached the market. Even if raised, the court would decline to consider such a position at this stage in the litigation since the court must accept as true all well-pleaded facts.

tained in the following paragraphs of the Complaint: ¶¶ 85–87 and 93–95.

• Bespeaks Caution and the PSLRA's Safe Harbor

Sprint defendants further assert their optimistic statements made throughout the class period were immaterial due to the operation of the judicially crafted "bespeaks caution" doctrine and the legislatively drafted safe harbor provision of the PSLRA.

• Bespeaks Caution

In *Grossman*, the Tenth Circuit specifically recognized the "bespeaks caution" doctrine. 120 F.3d at 1121. The *Grossman* court identified the doctrine as follows:

> Forward-looking representations are also considered immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potential misleading effect. This doctrine, which is called the "bespeaks caution" doctrine, "provides a mechanism by which a court can rule as a matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." However, not every risk disclosure will be sufficient to immunize statements relating to the disclosure, rather "the cautionary statements must be substantive and tailored to the specific future projec-

tions, estimates or opinions ... which the plaintiffs challenge."
*Id.* (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d. 1407, 1413 (9th Cir.1994); *In re Donald Trump Sec. Litig.*, 7 F.3d at 371). The "bespeaks caution" doctrine applies only to forward-looking statements as compared to the "speakers' beliefs concerning then-present factual conditions." *Id.* at 1123.

▐ The Sprint defendants direct the court's attention to the Joint Proxy, which contains certain warnings discussing the risks associated with the completion of the merger. (Complaint ¶ 73). The Sprint defendants assert these warnings sufficiently disclosed the risks involved. Plaintiffs offer several arguments for why the doctrine fails to immunize the Sprint defendants.

First, plaintiffs argue the statements at issue in this case, while facially appearing to be forward-looking, are in fact "statements of what [the Sprint defendants] currently believe based upon information at their disposal at the time the statement is made." (Pls. Response at 35). The court disagrees. The defendants' optimistic statements were clearly predictive in nature, because the subject matter of the speculative statements was uncertain. If the court were to accept plaintiffs' position, then all predictions would necessarily fall outside the scope of the doctrine.

▐ Plaintiffs next assert the disclosures contained in the Joint Proxy were insufficient to immunize the Sprint defendants' misleading optimistic statements. As a starting point, the court recognizes that "the mere presence of some cautionary language does not in and of itself neutralize untrue or misleading statements as a matter of law." *In re Synergen, Inc. Sec. Litig.*, 863 F.Supp. 1409, 1415 (D.Colo. 1994). As for temporal proximity,[8] the

---

8. Plaintiffs assert cautionary disclosures may only act to immunize misleading statements uttered after the disclosure. *See generally Grossman*, 120 F.3d at 1123 (noting that cautionary statements limited "the forward-looking predictions made in *subsequent* discus-

sions of the same transaction") (emphasis added). Therefore, plaintiffs argue the doctrine is inapplicable in regards to the defendants' statements offered prior to the March 9, 2000 release of the Joint Proxy. With the

**1222**

Tenth Circuit has made clear that the cautionary disclosures need not be contained in the same document or uttered in the same statement to adequately "bespeak caution." *Grossman,* 120 F.3d at 1122–23. However, "[r]emote cautions are less likely effectively to qualify predictions contained in separate statements." *Id.* at 1123. In addition, it is appropriate for the court to consider the formality by which the disclosures are dispersed to the market as compared to how the misstatements were disseminated. *Id.* Finally, "the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts." *Rubinstein v. Collins,* 20 F.3d 160, 171 (5th Cir.1994). *See also Gabriel Capital, L.P. v. NatWest Fin., Inc.,* 122 F.Supp.2d 407, 419 (S.D.N.Y.2000) ("The 'bespeaks caution' doctrine, however, does not apply where a defendant knew that its statement was false when made.").

In light of these general guidelines, the court finds that, as to the three omissions discussed above, (Complaint ¶¶ 85–87), the court finds the "bespeaks caution" doctrine to be inapplicable. As to the remaining optimistic statements, (Complaint ¶¶ 87 and 93–95), the court is unable to determine, as a matter of law, that the risk disclosures contained in the Joint Proxy sufficiently nullified any misleading effect. The Joint Proxy was issued approximately seven weeks before the first optimistic statement at issue. Although the court recognizes the formal nature of the Joint Proxy, the significant time lapse weighs against operation of the doctrine. Additionally, in light of the Sprint defendants' alleged omission of the FCC's decision to suspend its investigation, merely warning the market that FCC opposition *"may jeopardize or delay completion of the merger"* fails to convince the court that all possible risks were adequately disclosed. Dismissal pursuant to the bespeaks cation doctrine is not appropriate.

● PSLRA's Safe Harbor

Under the PSLRA, Congress provided a "safe harbor" for certain forward-looking statements by immunizing the speaker from liability if the following criteria are met: (1) the forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or immaterial;" or (2) the plaintiff fails to prove that the forward-looking statement "if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading" or, if made by a business entity, was "made by or with the approval of an executive officer of that entity; and made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1).

Similar to the court's analysis regarding the bespeaks caution doctrine, the court concludes that the Sprint defendants are not entitled to dismissal under the PSLRA's safe harbor provision. The court cannot say, as a matter of law, that the actionable statements were "accompanied by meaningful cautionary statements" since, as the court already noted, the Joint Proxy was issued approximately seven weeks before the first optimistic statement at issue. Moreover, in light of the omissions the court has deemed material, the court concludes that the Complaint adequately pleads that the Sprint defendants

court already concluding such statements were immaterial as a matter of law, there is

no need to address this issue.

made statements that were, at least, misleading. Dismissal under Rule 12(b)(6) is inappropriate on this issue.

### 5. Scienter

As previously discussed, the PSLRA and Rule 9(b) require that all elements of securities fraud be pled with particularity. Specifically, a plaintiff must plead with particularity facts permitting a strong inference that the defendants acted with fraudulent intent, or scienter. The court already has determined that the Complaint sufficiently alleges material omissions and optimistic statements (Complaint ¶¶ 85–87 and 93–95). The court must therefore determine whether plaintiffs have sufficiently pled scienter.

The PSLRA imposes strict pleading requirements for scienter in securities fraud cases. The PSLRA provides that in securities fraud cases, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Thus, the PSLRA requires that plaintiffs plead with particularity all facts giving rise to a "strong inference" that each defendant acted with scienter. A district court, upon motion of the defendant, "shall" dismiss any complaint that does not meet this requirements. *Id.* § 78u–4(b)(3)(A).

The appropriate level of scienter in securities fraud cases is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Recklessness, which is sufficient to satisfy the scienter requirement, is defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir.1996). Allegations of motive and opportunity are typically not sufficient in themselves to establish a strong inference of scienter. *Fleming*, 264 F.3d at 1262. However, allegations of motive and opportunity are relevant to a finding of scienter and may therefore be considered as part of the mix of information. *Id.* at 1263. Thus, in addition to motive and opportunity, the court must examine plaintiffs' allegations in their entirety to determine whether the complaint gives rise to a strong inference of scienter. *Id.*

The Sprint defendants argue that plaintiffs' Complaint fails to allege scienter with respect to each individual defendant. Plaintiffs' Complaint alleges that, because of their positions, each Sprint defendant (directors and officers of Sprint) had access to material, non-public information about the problems with the merger and knew that such information had not been disclosed. (Complaint ¶ 22). The Complaint further alleges that each individual Sprint defendant assisted in the scheme and was in a position to do so to given their executive positions, control over Sprint, and their stock ownership. (Complaint ¶ 29).

In support, the Sprint defendants primarily rely on *Fleming*, wherein the Tenth Circuit rejected the plaintiffs' allegations that the defendants, who simply were alleged to have occupied senior positions, had knowledge of allegedly fraudulent statements. *Fleming*, 264 F.3d at 1263–64. The alleged fraud in *Fleming* involved the defendants' failure to make explicit disclosures regarding pending litigation, which subsequently resulted in an adverse jury verdict and a damage award of $200 million. The court stated, "[T]he mere fact that the individual Defendants occu-

pied senior positions in the company, and that two of them knew of [the lawsuit] by early 1995, is not sufficient to imply knowledge of the specific fact of materiality." *Id.* at 1264.

*Fleming* thus stands for the proposition that mere allegations that defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements, is insufficient to plead scienter. In other words, such facts, *standing alone*, are not sufficient to raise a strong inference of scienter. If they were, every corporate executive who participates in the day-to-day management of his or her company would be exposed to liability for securities fraud. Other courts are in accord with this proposition. *See, e.g., In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F.Supp.2d 211, 228 (D.Mass.1999) (finding allegation that defendants held executive and managerial positions and had access to the alleged adverse non-public information insufficient by itself to raise strong inference that defendants had knowingly or recklessly caused the company to issue statements that were false or omitted material information); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F.Supp. 192, 204–05 (E.D.N.Y.1997) (allegation that defendant held senior management position and was "privy to inside information" insufficient, standing alone, to demonstrate strong inference of recklessness or conscious misbehavior).

The case at hand differs from *Fleming* in at least one material respect. In *Fleming*, the allegation that the defendants oc-cupied senior positions stood alone in raising (albeit insufficiently) an inference of scienter. In fact, the *Fleming* court considered the possible motives pled by the plaintiffs to determine whether the allegations, taken as a whole, were sufficient under the PSLRA. The court concluded that the only plausible alleged motive, while relevant, was not sufficient to raise a strong inference of scienter.

In this case, plaintiffs' allegation of motive is compelling. Plaintiffs allege that the Sprint defendants were motivated by $1.7 billion worth of stock options, previously unexercisable, which accelerated and vested upon shareholder approval of the merger. With respect to each individual Sprint defendant, the Complaint sets forth the number of previously unvested and unexercisable shares of common stock options that defendant owned, which then accelerated, vested, and became exercisable upon shareholder approval of the merger. With respect to those individual defendants who exercised their options after the merger, the Complaint states the number of options each defendant exercised and the amount of proceeds obtained as a result. Regarding those individual defendants who did not immediately exercise their options, the Complaint sets forth the total value of their options realized after the vote. In total, the value of the named Sprint defendants' accelerated stock options totaled nearly $600 million.[9]

The court finds that plaintiffs have set forth a motive which is highly relevant to plaintiffs' allegations of scienter. This al-

---

9. The Sprint defendants argue that plaintiffs' allegations of motive fail because, they contend, the defendants did not profit from the alleged scheme. The Sprint defendants point out that not all of the officers and directors exercised their options and, of those who did, it is not alleged that any of the individuals sold any of the stock associated with the option, thereby profiting from the sale. The court, however, views the vesting of the stock options as merely the first step in potentially reaping, in this case, tremendous financial gain. *See In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999) ("[W]e see no reason to distinguish vested stock options from shares because vested stock options can be converted easily to shares and sold immediately.").

leged motive is not a generalized motive shared by all companies but is, rather, specifically and uniquely related to each individual Sprint defendant and is particularly probative in light of the alleged prior alteration of the "change in control" provision. Plaintiffs' allegations of motive, coupled with the allegations that each Sprint defendant held positions of control and had access to material, non-public information, are enough to raise a strong inference of scienter with respect to each individual Sprint defendant.

 Upon review of the optimistic statements the court has deemed material, the court notes that only one, Sprint spokesman James Fisher's April 27, 2000 statement, was made prior to the shareholder vote. (Complaint ¶ 87). The remaining three statements, Sprint's April 28, 2000 press release, Sprint general counsel's May 18, 2000 statement, and Sprint spokesman's May 19, 2000 statement, were made after the shareholders approved the merger. (Complaint ¶¶ 93–95). Logically, after the shareholders approved the merger, the Sprint defendants' alleged motive disappeared: Upon shareholder approval, the Sprint defendants' stock options vested, and the alleged scheme was thus complete. Plaintiffs' Complaint fails to allege any motive with respect to the Sprint defendants' optimistic statements made after this point. Viewing plaintiffs' allegations in their entirety, and with no alleged motive regarding the three post-shareholder approval statements, plaintiffs have failed to raise a strong inference of scienter. In light of the strict pleading requirements for scienter, the court finds that there simply is no basis found in the Complaint for the court to conclude that the Sprint defendants intended to deceive, manipulate, or defraud

with respect to any statements made after April 28, 2000. The court holds that the statements made after shareholder approval are not actionable as a matter of law and, accordingly, grants Sprint defendants' motion to dismiss as to those statements contained in the following paragraphs of the Complaint: ¶¶ 93–95.

 Also, the individual Sprint defendants contend that they cannot be held liable for statements which they did not themselves make or which they were not involved in drafting or publishing. The only remaining statement at issue is the April 27, 2000 statement made by a Sprint spokesperson. The court points out that identification of corporate insider defendants, without matching specific misstatements with specific officers or directors, does not itself violate Rule 9(b). *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir.1997). Rather, the Tenth Circuit has recognized the group pleading doctrine, which allows plaintiffs to attribute statements generally to corporate officers and directors when the fraud allegations arise from misstatements or omissions in group-published information. *Id.* The court concludes that plaintiffs' allegations regarding Sprint's optimistic statements, in particular the April 27, 2000 statement made by a Sprint spokesperson,[10] falls within the group pleading doctrine and, therefore, satisfies Rule 9(b)'s pleading requirements.

Defendants next point out that the Complaint fails to set forth allegations that the Sprint defendants "knew" the DOJ or EC would in fact decide to block the merger or "must have known" in advance how the regulatory process would end. Defendants argue this is fatal to plaintiffs' claims, asserting that plaintiffs must set

**10.** The Sprint defendants do not assert that this argument applies to the alleged omissions which this court has deemed material.

forth specific facts that the Sprint defendants knew, at the time the optimistic statements were made, that the merger would not be consummated. However, the question is not whether the Sprint defendants knew that the merger ultimately would be blocked; rather, the question is whether the Sprint defendants knew that the nondisclosure of certain information, coupled with the April 27, 2000 optimistic statement that the merger would go through, would mislead its shareholders. *Id.* at 1264 (stating that the important issue is not whether the defendants knew the underlying facts, but whether defendants knew that not disclosing certain information posed substantial likelihood of misleading a reasonable investor).

■■■ The court finds that plaintiffs adequately have pled at least recklessness on the part of the Sprint defendants. Plaintiffs have alleged that the Sprint defendants knew in April 2000 that the DOJ was unlikely to approve of the merger, that the FCC was suspending its investigation into the merger, and that the EC had "serious concerns" regarding the merger. Yet, according to plaintiffs, the Sprint defendants chose not to disclose this information and, moreover, issued an optimistic statement regarding regulatory approval so that Sprint shareholders would vote in favor of the merger. Accepting as true plaintiffs' well-pleaded facts, the court concludes that the Complaint sufficiently alleges that the Sprint defendants departed from the standards of ordinary care and that they knew, or it was so obvious that they must have been aware, that such omissions and statements presented a danger of misleading buyers or sellers. In other words, the information received from the DOJ, FCC, and the EC was significant such that the Sprint defendants were reckless in not disclosing this information and in issuing a favorable statement about regulatory approval. Plaintiffs have alleged facts creating a strong inference of reckless conduct.

### B. Financial Statements

■■■ The court turns to plaintiffs' allegation that the Sprint defendants failed to make proper and timely provisions for doubtful accounts receivable, thereby inflating Sprint's 1Q00 profits. Plaintiffs allege that during 1Q00, Sprint was having problems with non-paying customers due to "Sprint's inability to properly bill and service many customers." (Complaint ¶ 112). In support, plaintiffs assert two factual allegations: 1) Sprint's main service call center had 1,400 complaints lodged against it with the Better Business Bureau from 1997 to 2000 and 2) one customer, Cheetah Communications LLC (Cheetah), had disputed Sprint's billing since 1998 involving millions of dollars and that Cheetah ultimately sued Sprint in October 2000 to prevent Sprint from cutting off its service. (Complaint ¶¶ 112 and 113). Plaintiffs allege that Sprint should have increased its reserves for doubtful accounts in 1Q00 and that Sprint's failure to do so was fraudulent. Significant to this court is the March 29, 2002 opinion rendered in *In re MCI Worldcom, Inc. Sec. Litig.*, 191 F.Supp.2d 778 (S.D.Miss. 2002). In *In re Worldcom*, the plaintiffs alleged that WorldCom's financial statements were false and misleading because WorldCom failed to timely write-off certain uncollectible accounts. *Id.* at 789. The *In re Worldcom* plaintiffs' only support for their assertion that the write-offs were untimely was that the timing and the size of the write-off in 3Q00 were indicative of fraud. The *In re Worldcom* court, in rejecting plaintiffs' accounting fraud claims, expressly held that "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Id.* at 790 (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990) (finding, "If all that is involved is

a dispute about the timing of a writeoff, based on the estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence"); *Kriendler v. Chem. Waste Mgmt., Inc.*, 877 F.Supp. 1140, 1154 (N.D.Ill.1995) (finding that "[t]iming, alone, cannot support an inference of fraud")). The court further stated that, "to establish scienter based on improper accounting, Plaintiffs must plead with particularity facts demonstrating that 'the accounting judgments that were made were such that no reasonable accountant would have made the same decision if confronted with the same facts.'" *Id.* (citing *In re Miller Indus., Inc.*, 120 F.Supp.2d 1371, 1382 (N.D.Ga. 2000). The *In re Worldcom* court concluded that the plaintiffs had failed to plead facts showing that the decision to write off uncollectible accounts in 3Q00, rather than on an earlier date, was unreasonable.

In line with the reasoning set forth in *In re Worldcom*, the court notes that, the mere fact that Sprint increased its reserves for doubtful accounts in 3Q00 does not, by itself, call into question the accuracy of the 1Q00 statement. Such an allegation, standing alone, is nothing more than pleading fraud by hindsight. *Caprin v. Simon Transp. Servs.*, 112 F.Supp.2d 1251, 1257 (D.Utah 2000) (plaintiff's allegation, that an increase in operating supplies and expenses in a future period meant that defendants fraudulently misstated prior periods, was nothing more than fraud by hindsight). In this case, the Complaint contains no specific factual allegation that Sprint improperly accounted for its doubtful accounts reserve in 1Q00. The mere comparison between 3Q00 and 1Q00 is not enough. Accordingly, in these circumstances, plaintiffs must plead with particularity facts demonstrating that a reasonable accountant would have chosen to increase the allowance for doubtful accounts receivable in 1Q00.

Plaintiffs' only factual assertions fall short of sufficiently pleading that Sprint should have increased its doubtful accounts receivable in 1Q00. Plaintiffs' first fact, that Sprint's main service call center had 1,400 complaints lodged against it with the Better Business Bureau from 1997 to 2000, does not support plaintiffs' allegation that Sprint's financial statement in the first quarter of 2000 was false and misleading. While 1,400 complaints over a three- to four-year period may be material in some circumstances, there simply is no allegation that Sprint should have considered the complaints in accounting for its doubtful receivables *in 1Q00*. Moreover, plaintiffs' second factual allegation, that Cheetah had disputed Sprint's billing since 1998 and ultimately sued Sprint in October 2000, again does not support plaintiffs' assertion that Sprint should have accounted for this *in 1Q00*. To the contrary, the fact that Cheetah did not sue Sprint until October 2000 supports the notion that Sprint should not have factored this in its doubtful accounts receivable until after October 2000.[11] Plaintiffs' claim of accounting fraud is not supported by specific facts that permit an inference that receivables of these types were uncollectible and that the Sprint defendants acted with scienter in misrepresenting Sprint's financial condition.

In sum, the Complaint lacks any factual allegation that the amount set forth in Sprint's 1Q00 statement for doubtful accounts receivable should have been higher. In other words, plaintiffs have failed to plead facts showing that Sprint's decision to write off certain accounts in 3Q00, rather than in 1Q00, was unreasonable. Without such allegations, dismissal is appropri-

---

**11.** The court is not aware, nor do the parties proffer, whether Sprint in fact considered this in accounting for its doubtful receivables after October 2000.

ate. *See Kane v. Madge Networks N.V.,* 2000 WL 33208116, at *5 (N.D.Cal. May 26, 2000) ("[A]ccounts receivable reserves are relatively 'soft' information, despite the fact that they are expressed in dollars and cents. Thus, it is not enough to allege that the bad debt reserves were inadequate, because even reasonable predictions turn out to be wrong. Instead, plaintiffs must allege with particularity facts that show that the initial prediction was 'a falsehood.' ") (citing *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1549 (9th Cir.1994)), *aff'd* 32 Fed.Appx. 905, 2002 WL 506286 (9th Cir.2002). Moreover, plaintiffs' allegation that the Sprint defendants violated the Generally Accepted Accounting Procedures (GAAP) is not enough to save plaintiffs' accounting fraud claim. *Fleming,* 264 F.3d at 1261 (holding that, only where allegations of GAAP violations are coupled with evidence of the defendant's fraudulent intent to mislead investors, may such allegations be sufficient to state a claim). Plaintiffs' claim that the Sprint defendants failed to make proper and timely provisions for doubtful accounts receivable in 1Q00 is hereby dismissed.[12]

- Causation

- Loss Causation

 In a securities fraud case, plaintiffs must establish two components of causation: transaction (but/for) causation and loss (proximate) causation. To show loss causation, plaintiffs must set forth how "the misrepresentation touches upon the reasons for the investment's decline in value." *TBG, Inc. v. Bendis,* 841 F.Supp. 1538, 1563 (D.Kan.1993) (citation omitted). Stated another way, plaintiffs must plead that defendants' material misrepresentations or omissions actually caused plaintiffs' injury. As the court in *TBG* ex-

plained, "The loss causation requirement serves as a limiting device in securities claims. The rationale behind requiring loss causation is that a defendant should only be held liable for the foreseeable consequences of the defendant's actions." *Id.*

 Specifically, to adequately plead loss causation, plaintiffs in this case may allege that the price of Sprint common stock was artificially inflated by the Sprint defendants' materially misleading omissions and statements when plaintiffs made their respective purchases. *Picard Chem., Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101, 1126 (W.D.Mich.1996). However, it is not plaintiffs' burden to prove loss causation in their pleadings. *In re Accelr8 Tech. Corp. Sec. Litig.,* 147 F.Supp.2d 1049, 1057 (D.Colo.2001). Rather, "it is sufficient at this stage of the proceedings that Plaintiffs have alleged they have suffered damage and this damage was caused by the misleading statements of the Plaintiffs." *Id.*

The Complaint alleges that the Sprint defendants omitted material information and made numerous misrepresentations regarding the likelihood the merger would be consummated and that, as a result, plaintiffs paid artificially inflated prices for Sprint publicly traded securities. Furthermore, the Complaint specifically pleads that, when the truth regarding merger was finally revealed, the price of Sprint's stock fell 15%, from $60 to $51 per share. (Complaint ¶ 99). Defendants' argument, that the stock price dropped because the merger was called off, rather than because of any alleged misrepresentations, is unavailing at this stage in the litigation. Whether the omissions and remaining alleged misstatement actually

---

12. Because the court has concluded plaintiffs fail to state a claim for fraud based on Sprint's reported first quarter earnings, the court need not address the Sprint defendants' argument that it cannot be liable for the analysts' reports about the company's projected performance in 2000.

could have been the cause-in-fact of the price of Sprint stock raises an issue of fact and, as such, is a question properly reserved for a motion for summary judgment or for the trier of fact. *See Perrigo,* 940 F.Supp. at 1126. The court finds that plaintiffs adequately have alleged they have suffered damage and this damage was caused by the misleading statements of the Sprint defendants.

● Transaction Causation

■ In addition to loss causation, plaintiffs must plead transaction causation. To plead transaction causation, plaintiffs must allege that they would not have invested in the instrument if the defendants had stated truthfully the material facts at the time of sale. *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir.1997). In other words, plaintiffs must plead that the violations in question caused plaintiffs to engage in the transaction. *McGonigle v. Combs,* 968 F.2d 810, 821 (9th Cir.1992).

■ The Compliant alleges that plaintiffs "would not have purchased Sprint publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements." With respect to those plaintiffs' claims based on shares purchased *before* the DOJ announcement blocking the merger, the court finds that plaintiffs adequately have pled transaction causation.

■ However, plaintiffs' claims based on shares purchased *after* the DOJ announcement fail as a matter of law. Plaintiffs can state no claim that they relied on

omissions or material misrepresentations about the merger prospects since, at the time the DOJ announced it was blocking the merger, those plaintiffs knew the merger had failed.[13] Accordingly, claims premised on the purchase of Sprint stock after the DOJ announcement are hereby dismissed for lack of transaction causation.

● Section 20(a) of the Exchange Act

Plaintiffs' second count alleges a claim against individual defendants Esrey, LeMay, Lorimer, Ausley, Batts, Bon, Hockaday, Hook, Rice, Smith, Sommer, Turley, and Sprint. Section 20(a) of the Exchange Act imposes secondary liability on "controlling persons." To state a claim under § 20(a), a plaintiff must first state a viable primary claim for violation of § 10(b). Thus, to the extent that the court has dismissed plaintiffs' § 10(b) claims, those claims also are dismissed as to these defendants. IT IS THEREFORE ORDERED that the motions for Joinder of Linda Koch Lorimer and Warren L. Batts in the Sprint Defendants' Motion to Dismiss (Doc. 102); Joinder of Defendant Ron Sommer in the Sprint Defendants' Motion to Dismiss (Doc. 116); Joinder of Defendant Michel Bon in the Sprint Defendants' Motion to Dismiss (Doc. 120): and Joinder of Defendant Andrew Sukawaty in the Sprint Defendants' Motion to Dismiss (Doc. 127) are granted.

IT IS FURTHER ORDERED that plaintiffs' Motion to Strike Certain Exhibits and Impertinent Language Contained in Defendants' Motion to Dismiss (Doc. 105) is granted in part and denied in part,

---

**13.** Plaintiffs claim that two lead plaintiffs, New England Health Care Employees Pension Fund and Plumbers & Pipefitters National Pension Fund, purchased their shares after the DOJ announcement but before Sprint revealed its true financial condition in its 3Q00. The court already has found that plaintiffs cannot state a claim based on Sprint's 1Q00 financial statements because those statements were not fraudulent. Therefore, these plaintiffs can state no actionable claim based on securities they purchased in reliance on Sprint's reported 1Q00 earnings.

and Sprint Defendants' Motion to Strike the Hakala Affidavit (Doc. 111) is granted.

IT IS FURTHER ORDERED that Sprint Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint (Doc. 94) is granted in part and denied in part. The only remaining claims in this lawsuit are those based on the Sprint defendants' alleged omissions and misstatements contained in ¶¶ 85, 86, and 87 of the Complaint.